**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GERALDINE FABERY**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:11cv579 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

July 9, 2012

I.   **INTRODUCTION**

Geraldine Fabery ("Plaintiff") brings this action on behalf of her minor daughter ("L.F.")

pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner

of Social Security ("Defendant" or "Commissioner") denying her application for supplemental

security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f

("Act").  This matter comes before the court on cross motions for summary judgment.  (ECF

Nos. 9, 11).  The record has been developed at the administrative level.  For the following

reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for

Summary Judgment is GRANTED.

1

## II.   PROCEDURAL HISTORY

Plaintiff filed for SSI, on behalf of L.F., with the Social Security Administration on December 17, 2007, claiming disability beginning on October 9, 2000 due to limitations stemming primarily from mental impairments. (R. at 128 – 34)[1].  Benefits were initially denied on April 14, 2008.  (R. at 82 – 86).  A hearing was scheduled for November 19, 2009, and Plaintiff appeared to testify, represented by counsel.  (R. at 29 – 79).  L.F. also appeared, but did not testify.  (R. at 29 – 79).  The Administrative Law Judge ("ALJ") issued his decision denying benefits to L.F. on January 12, 2010.  (R. at 4 – 28).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on March 3, 2011, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 3).

Plaintiff filed her Complaint in this Court on May 5, 2011.  (ECF No. 4).  Defendant filed his Answer on July 11, 2011.  (ECF No. 6).  Cross motions for summary judgment followed.

## III.   STATEMENT OF THE CASE

General Background

L.F. was born on October 9, 1994, and was fifteen years of age at the time of her administrative hearing.  (R. at 38).  L.F. was in the ninth grade, and attended Greensburg Salem High School.  (R. at 43).  She resided with her mother and father, and with an older sister with more serious mental handicaps.  (R. at 39).  The impairments alleged by Plaintiff to be primarily responsible for L.F.'s disabling limitations were "separation anxiety" and "mental health."  (R. at 185).

---

[1]      Citations to ECF Nos. 7 – 7-10, the Record, *hereinafter*, "R. at __."

Plaintiff completed a Function Report on behalf of L.F. on February 14, 2008.  (R. at 192 – 200).  In it, Plaintiff indicated that L.F.'s ability to communicate was not limited.  (R. at 195).  She was alleged to be limited with respect to understanding and using what she had learned. (R. at 196).  L.F. was alleged to be incapable of reading and understanding stories in books, magazines, and newspapers.  (R. at 196).  She was, however, capable of reading and understanding sentences in comics and cartoons, spelling words of more than four letters, telling time, adding, subtracting, multiplying, and dividing numbers over ten, understanding money and making correct change, and understanding, carrying out, and remembering simple instructions. (R. at 196).  Plaintiff stated that L.F.'s physical abilities were not limited.  (R. at 106).

With the exception of leaving her mother, L.F.'s impairments did not affect her social activities or behavior.  (R. at 197).  However, Plaintiff claimed that L.F. was not able to cook a meal, take medication, use mass transit, or accept criticism or correction.  (R. at 198).  L.F.'s attention and focus were limited in terms of completing arts and crafts projects and completing chores.  (R. at 199).  Yet, L.F. was capable of staying busy on her own, could finish things she started, and completed homework on-time.  (R. at 199).  At the end of the Function Report, Plaintiff stated that – generally – her daughter had a need to be in control.  (R. at 199).  She had difficulty taking "no" for an answer.  (R. at 199).  L.F. had difficulty getting along with her sister.  (R. at 199).  She also had a habit of sleeping with her mother and being overly dependent upon her mother.  (R. at 199).

School Records

A Reevaluation Report ("RR") regarding L.F.'s educational needs was completed by educators in the Greensburg Salem School District on November 14, 2005, while L.F. was in the fifth grade.  (R. at 142 – 58).  The purpose of the RR was to determine how best to address L.F.'s

functional deficits as she progressed with her education.  (R. at 142 – 58).  It was noted that L.F.

had been receiving speech and language support through an Early Intervention plan initiated

prior to L.F.'s entrance into kindergarten.  (R. at 142).  Despite significant progress, L.F. still

exhibited some difficulty with vowel distortion and great difficulty self-monitoring

conversational speech.  (R. at 142 – 43).  However, she was found by her elementary educators

to no longer be in need of speech and language support.  (R. at 143).

       The RR indicated that L.F.'s "rate of retention" – how well L.F. retained what was taught

and what she had taught herself – was 100%, and her "rate of acquisition" – how well L.F.

acquired new skills and new knowledge – was also 100%.  (R. at 144).  L.F.'s other strengths

included being cooperative and easy to manage, being able to retain information with repetition,

being honest, exhibiting good computation and spelling skills, being attentive, and respecting

others and their property.  (R. at 145).  Weaknesses included difficulty with reading

comprehension, language expression, creative writing, abstract thinking, separation from her

mother, speaking clearly to others, understanding directions, ideas, or concepts, being withdrawn

and isolated, lacking self-confidence, being poorly coordinated, and exhibiting excessive

shyness, timidity, and fearfulness.  (R. at 144 – 45, 151 – 52).

       L.F.'s full scale I.Q. was 72, falling within the borderline range of intelligence.  (R. at

148).  The confidence interval was 95%.  (R. at 148).  Additionally, testing indicated that L.F.

was functioning at an extremely low cognitive level with respect to non-verbal areas –

evidencing extreme weakness in non-verbal, visual-spatial-organizational development, and

working memory.  (R. at 148 – 49).  L.F.'s processing speed was average, however.  (R. at 149).

The RR concluded by finding that L.F. had a "Special Learning Disability" in terms of

"pseudoword decoding."  (R. at 155).  The RR suggested L.F. receive a blend of direct special

education services along with accommodations in regular education programs/classes.  (R. at
155).

Records from Greensburg Salem School District also include an Individualized
Educational Program ("IEP") formulated for L.F. in May 2007, and implemented in August
2007. (R. at 159 – 74).  At the time, L.F. was to enter the seventh grade.  (R. at 159).  It was
noted that L.F. had been successfully engaged in regular education classes, with an aid, three
days a week for Language Arts, and five days a week for Math.  (R. at 162).  L.F. had an adapted
curriculum to meet her learning needs in Social Studies and Science.  (R. at 162).  The IEP stated
that L.F. was very pleasant, she tried her best, she consistently completed homework in all
classes, she was willing to help her peers, she got along well with others, she was a very good
oral reader, she was polite and respectful towards adults and peers, and she was a good speller.
(R. at 162).

The IEP also noted L.F.'s needs requiring accommodation to include: reading
comprehension, written comprehension and grammar, difficulty with directions for projects and
lengthy assignments, and lack of self-confidence.  (R. at 162).  However, it was also found that
L.F.'s functional performance was appropriate in all areas, and that she could be successful in
regular education classes in all subjects with adaptations.  (R. at 162).  L.F. was considered to be
capable of more than she believed, and needed reassurance and positive feedback.  (R. at 162).

The IEP stated that when taking the Pennsylvania System of School Assessment
("PSSA"), L.F. would receive extended time and additional guidance with respect to PSSA
requirements.  (R. at 163).  Throughout the academic year, L.F. would receive itinerant learning
support, as needed, and would be taught in regular education classes.  (R. at 167, 172).  She
would also have the help of a learning support/inclusion teacher in certain regular education

classes (Math, Language Arts, Science, and Social Studies).  (R. at 167, 172).  Adaptations for certain classes would include alternative test delivery, minimal reliance on independent reading, repetition and practice, structured study guides, incremental presentation of new material, clear/concise directions, primary oral and written directions, frequent checks for understanding, extended time for assignments when necessary, and frequent feedback and positive reinforcement.  (R. at 169).

On March 11, 2008, L.F.'s learning support/inclusion teacher completed a Teacher Questionnaire to document those limitations which L.F. was observed to experience.  (R. at 206 – 13).  The teacher indicated that she had aided L.F. for six months.  (R. at 206).  The teacher accompanied L.F. to her science and language classes to provide assistance, as needed.  (R. at 206).  In terms of acquiring and using information, L.F. was indicated as having anywhere from slight problems to serious problems.  (R. at 207).  With respect to attending and completing tasks, L.F. had a slight problem working at a reasonable pace, and had an obvious problem carrying out multi-step instructions.  (R. at 208).  In terms of interacting and relating to others, L.F.'s teacher noted that she had slight problems using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, and interpreting the meaning of facial expression, body language, hints, and sarcasm.  (R. at 209).  L.F. had an obvious problem using adequate vocabulary and grammar to express thoughts/ ideas, and with daily conversation.  (R. at 209).

Another IEP was formulated for L.F. in May 2008, and implemented in August 2008, in preparation for her eighth grade academic year.  (R. at 242 – 57).  It was noted that diagnostic testing during L.F.'s seventh grade academic year showed that she demonstrated a sixth grade reading level, a fourth grade math level, and third grade level mathematical problem solving.  (R.

at 244).  However, educational staff believed that L.F. could be successful in regular education

classes with continued adaptations and modifications, and with the continued assistance of a

learning support/inclusion teacher.  (R. at 244).

L.F.'s strengths were noted to be her pleasant personality, strong work ethic, oral reading,

spelling, appropriate behavior around others, respect of adults and peers, and work completion.

(R. at 244).  Plaintiff's weaknesses included reading comprehension and written

expression/grammar.  (R. at 244).  She also lacked confidence, in spite of being "very capable."

(R. at 244).

The IEP stated that L.F. would take the PSSA with accommodations, as before.  (R. at

246, 265).  L.F.'s curriculum would also focus more intensively on her writing skills, reading

comprehension, and mathematics skills – setting specific benchmarks to gauge a desired success

rate.  (R. at 248 – 51).  L.F. would still be provided with a learning support/inclusion teacher and

other itinerant educational support as needed.  (R. at 252, 254).  She was to receive frequent

feedback, well-defined directions, additional time for questions, notes from the teacher,

structured study guides, graphic organizers, preparation for changes in routine, tasks broken into

manageable pieces, organizational help, social skills modeling, re-testing as needed, and a daily

academic support class.  (R. at 271).  By November 2008, L.F. was meeting all of her IEP goals,

and was making adequate academic, social, and emotional progress.  (R. at 273).

Another RR was completed on November 13, 2008 by L.F.'s educators.  (R. at 278 –

285).  Generally, it was noted that L.F. had no significant health issues.  (R. at 278).  She related

well to classmates, was kind and respectful, had approximately eight close friends, attended

movies and football games with friends, and attended school dances.  (R. at 278).  Standardized

testing in April 2008 showed that L.F. had a 75% success rate in reading, and an 80% success

rate in spelling.  (R. at 279).  In mathematics, L.F. scored well below grade level, although she was noted to be working successfully in her eighth grade-level Algebra class.  (R. at 279).

In the RR, L.F.'s teachers felt that she should continue with her most recent IEP adaptations, including: preferential classroom seating, learning support/inclusion for Language Arts and Algebra, frequent feedback for understanding directions, well-defined directions, use of an agenda book, additional time for questions, modified tests, simplified tasks, organizational checks, social skills modeling, hands-on learning opportunities, re-testing as needed, extensions of time for completing tasks, daily academic support classes, study packets for tests, academic monitoring, notes provided by teachers as needed, graphic organizers, word banks for tests, extra preparation for changes in routine, and close contact with a guidance counselor.  (R. at 279).  However, based upon her consistent performance in middle school, L.F. was no longer believed to be in need of standardized testing to gauge her progress.  (R. at 280).  L.F.'s academic performance suggested that she would do well in jobs that are social, conventional, and artistic, including: writer, stage director, counselor, case worker, speech therapist, bookkeeper, or tax expert.  (R. at 280).

L.F. was still considered to have a learning disability with respect to her reading.  (R. at 281).  However, her achievement in her Language Arts class was well above that of her peers. (R. at 284).  Her achievement in Algebra was also well above that of her peers.  (R. at 284). L.F.'s achievement in Social Studies and Science was only slightly below that of her peers.  (R. at 284).  L.F. was capable of maintaining focus, and was willing to seek help when needed.  (R. at 284).  It was concluded that L.F.'s disability was not due to any visual, hearing, or motor deficits, nor mental retardation or emotional disturbance.  (R. at 284).

L.F.'s educators met again on November 13, 2009 for purposes of formulating an IEP to be effective November 14, 2009.  (R. at 291 – 309).  It was noted therein that L.F. was not visually impaired, she did not have special communication needs, she did not require assistive technology, she spoke English proficiently, and she did not exhibit behaviors which would tend to inhibit her ability to learn.  (R. at 294).  Standardized testing scores from Spring 2008 were again remarked upon – L.F.'s educators noting that her spelling and reading skills were at a sixth grade level at that time, and that her math computation and problem solving skills were at fourth and third grade levels, respectively.  (R. at 295).  L.F. was noted to require adaptations to her learning environment to be successful.  (R. at 295).

As had been noted consistently throughout her record, L.F.'s areas of weakness included reading comprehension and written expression.  (R. at 295).  She was also noted to avoid activity in her physical education class.  (R. at 295).  However, L.F.'s strengths included a positive attitude at school, showing effort in all classes, positive relationships with adults and peers, responsibility, and oral reading and spelling skills.  (R. at 295).  L.F. was to continue to receive itinerant learning support, and her IEP otherwise remained largely unchanged.  (R. at 291 – 309).

Academic Performance

PSSA testing in 2006 showed that in fifth grade, L.F. demonstrated "proficient" performance in reading, "advanced" performance in mathematics, and "basic" performance in writing.  (R. at 176 – 77).  2007 PSSA results showed that in sixth grade, L.F. exhibited "below basic" performance in reading and mathematics.  (R. at 178).

L.F.'s grades for the first term of her ninth grade year included two A's, one B, one C, and one D – in physical education.  (R. at 287).  L.F.'s final grades for her eighth grade year included three A's, four B's, and one C.  (R. at 288).  L.F.'s final marks for her seventh grade

9

year included eight A's, and three B's.  (R. at 289).  In sixth grade, L.F. earned one A, three B's, and four passing – "P" – grades.  (R. at 290).

Medical and Functional Assessments

L.F. underwent a psychological evaluation with John Carosso, Psy.D. on October 29, 2007.  (R. at 316 – 29).  Dr. Carosso noted that L.F. was considered to be healthy, with no history of asthma, allergies, seizures, developmental abnormalities, or trauma.  (R. at 318).  L.F. had received some psychiatric treatment around six years of age due to observed anxiety and separation issues.  (R. at 318).  The therapy proved ineffective and was discontinued.  (R. at 318).  L.F. was brought to Dr. Carosso due to an alleged resurgence in her anxiety and separation issues.  (R. at 318).  Plaintiff described L.F. to Dr. Carosso as "clingy," and stated that she experienced jealousy towards her old sister because she believed she did not receive as much attention from her parents.  (R. at 318).  L.F. was demanding of Plaintiff when at home.  (R. at 318).  L.F. was defiant and argumentative with Plaintiff, and often asked Plaintiff to sleep with her at night.  (R. at 318 – 19).  Yet, she would help with household chores.  (R. at 319).  L.F. struggled to control her appetite and weight.  (R. at 319).

Outside the home, L.F. occupied her time by going to the movies and ice skating with friends.  (R. at 319).  During her free time, L.F. frequently used the computer, talked on the telephone, and watched television.  (R. at 319).   At school, L.F. worked hard, received adequate/good grades, functioned well behaviorally, socialized with her peers, and maintained friendships.  (R. at 319).

Dr. Carosso observed L.F. to be alert and oriented, and well groomed.  (R. at 320).  While she initially was quite nervous, her comfort level slowly increased.  (R. at 320).  She was moderately engaging.  (R. at 320).  L.F. described having problems getting along with her sister,

but expressed a willingness to work on their relationship.  (R. at 320).  She explained that she

sometimes had difficulty separating from her mother.  (R. at 320).  Following some objective

testing, Dr. Carosso found that L.F. did not have clinically significant depression or anxiety, and

she exhibited no thought disorder or hallucinations.  (R. at 320).  L.F. appeared to have almost

average intellectual functioning, although she had poor attention, concentration, insight, and

judgment.  (R. at 320).

     Dr. Carosso diagnosed separation anxiety disorder and disruptive behavior disorder.  (R.

at 321).  L.F. was given a global assessment of functioning[2] ("GAF") score of 58.  (R. at 321).

Dr. Carosso also noted that L.F.'s highest GAF score over the previous year was 62.  (R. at 321).

It was recommended that L.F. engage in wraparound care, including approximately four hours of

---

[2]    The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

therapy per week, case management to identify and procure community resources and support, and involvement in structured extracurricular activities supervised by adults.  (R. at 322).

 L.F. attempted a weight management program beginning on November 13, 2007.  (R. at 331 – 42).  L.F. was significantly overweight, and was very motivated to lose weight due to some teasing.  (R. at 332).  Plaintiff's lifestyle and eating habits were the primary contributors to her increasing weight.  (R. at 332 – 33, 335 – 37).  Goutham Rao, M.D. and Dana L. Rofey, Ph.D., consulted with L.F. and made a number of suggestions for developing a routine to reduce caloric intake as well as increase favorable physical activity.  (R. at 333 – 42).  L.F. was diagnosed with maladaptive health behaviors affecting abnormal weight gain.  (R. at 338).  Dr. Rofey indicated that L.F. had a GAF score of 74.  (R. at 338).

On April 4, 2008, L.F. was evaluated by Chantal Deines, Psy.D. on behalf of the Bureau of Disability Determination.  (R. at 407 – 17).  A new IQ test was administered by Dr. Deines, and marked improvement over an IQ test administered by L.F.'s school three years prior was noted in multiple categories.  (R. at 408 – 09).  In 2005, L.F.'s full scale IQ was 72.  (R. at 409).  At the time of Dr. Deines' evaluation, L.F.'s IQ was 85.  (R. at 409).  However, L.F. did still appear to struggle with some learning disorder.  (R. at 409).

Dr. Deines noted L.F.'s history of separation anxiety and difficulty making adjustments.  (R. at 409).  Dr. Deines noted that prior to evaluating L.F., she was unusually close to her mother.  (R. at 410).  Plaintiff informed Dr. Deines that L.F. was often domineering at home, and had behavioral issues with her elder sister.  (R. at 410).  L.F. was often argumentative when asked to help with household chores.  (R. at 411).  She also had to be regularly reminded to brush her teeth.  (R. at 411).  Dr. Deines indicated that L.F. did not have a significant psychiatric treatment history, and no notable health problems other than obesity.  (R. at 410 – 11).  Dr.

Deines recorded that L.F. did not follow through with her weight management program.  (R. at 410).

L.F. did not exhibit difficulty with attention or concentration. (R. at 411 – 12).  L.F. was cooperative during her evaluation and showed no difficulties with orientation or memory.  (R. at 412).  L.F. did not always follow questions, and showed little interest in asking questions.  (R. at 413).  L.F. appeared conscious of her weight and did not seem at ease with her body.  (R. at 413).  With respect to her mother, L.F. exhibited obvious separation anxiety.  (R. at 414).  L.F. did enjoy spending time with her friends at the movies and the mall, and enjoyed playing volleyball and going to a local creek.  (R. at 414).  L.F. admitted that she still frequently asked her mother to stay with her in her room at night.  (R. at 414).  Dr. Deines' impression after interviewing L.F. was that she downplayed many of her problems.  (R. at 414).

At the conclusion of the evaluation, Dr. Deines diagnosed L.F. with separation anxiety disorder and learning disorder.  (R. at 414).  Dr. Deines assessed L.F. with a GAF score of 50. (R. at 415).  Her prognosis for L.F. was optimistic.  (R. at 415).  L.F.'s separation anxiety was a significant problem, but could be addressed with adequate intervention.  (R. at 415).  L.F. had been able to control her family with her anxious behavior.  (R. at 415).  She received special privileges as a result.  (R. at 415).  Dr. Deines believed that an intervention would soon be needed to address this behavior.  (R. at 415).

In terms of her ability to acquire and use information, Dr. Deines felt that L.F. was more intellectually limited than suggested by objective testing.  (R. at 416).  While her behavior did not interfere with her ability to learn, L.F.'s language and verbal skills were not at the expected level and she had difficulty with complex thoughts.  (R. at 416).  Yet, L.F. was able to follow directions, ask for information, and explain things to others.  (R. at 416).  With respect to

13

attending to and completing tasks, Dr. Deines found L.F. was able to focus, deal reasonably with frustration, and maintain attention. (R. at 416). L.F. had no difficulty changing activities or shifting her attention. (R. at 416). L.F. was capable of beginning, carrying through, and finishing activities of her choosing. (R. at 416). Any problems associated with failing to complete tasks had to do with L.F.'s ability to manipulate her way out of undesirable activities. (R. at 416). In terms of interacting and relating with others, L.F. was suspected to have some difficulty with peers and criticism, but did have friends, was able to comply with rules, was respectful, could speak intelligibly and fluently, had no issues with communication skills, and could follow social rules of interaction. (R. at 416).

On April 11, 2008, state agency evaluator Arlene Rattan, Ph.D. completed a Childhood Disability Evaluation Form following a review of L.F.'s record. (R. at 418 – 23). Dr. Rattan found that Plaintiff suffered impairments including separation anxiety disorder, learning disorder, and disruptive behavior disorder. (R. at 418 – 23). According to Dr. Rattan, none of the impairments met any of the listing requirements for an automatic finding of disability. (R. at 418 – 23). Subsequently, Dr. Rattan analyzed L.F.'s level of functioning. She concluded that L.F. had less than marked limitation in acquiring and using information, no limitation attending to and completing tasks, and less than marked limitation interacting and relating with others. (R. at 418 – 23).

Administrative Hearing

Plaintiff testified on behalf of L.F. at the administrative hearing before the ALJ. Plaintiff began by testifying that L.F.'s alleged disability onset date was just an estimate, and was not the result of a particular event. (R. at 38). Plaintiff stated that L.F. did not have any problems with her personal hygiene. (R. at 42). She was capable of caring for herself, including making meals.

14

(R. at 48). L.F. was aware of dangers to herself. (R. at 75). Plaintiff explained that L.F. had

been gaining weight over the years, and at the age of fifteen – and at just under five feet in height

– L.F. weighed approximately two hundred pounds. (R. at 39 – 40). L.F. did not adhere to a

healthy diet plan. (R. at 40 – 41). L.F. allegedly complained of shortness of breath when

walking up steps or running. (R. at 70). Apparently, L.F. was also increasingly clumsy. (R. at

70).

  Plaintiff described L.F. as being very attached, and needed to be pushed to leave

Plaintiff's side to go out or go to school. (R. at 39). L.F. would often make up excuses to stay

home from school. (R. at 67). When at home, L.F. was very often at Plaintiff's side, and would

become upset if unable to accompany Plaintiff. (R. at 62). L.F. frequently requested that

Plaintiff stay with her in her bedroom. (R. at 62 – 63). L.F. became easily upset if not appeased.

(R. at 64). Plaintiff believed that L.F. actively attempted to control both of her parents. (R. at

65). At the time of her administrative hearing, L.F. was engaging in therapy. (R. at 47).

  L.F. also expressed jealousy over the amount of time her parents had to spend helping her

older, special needs sibling. (R. at 73). Plaintiff stated that L.F. did not feel that she received the

attention she deserved. (R. at 73). L.F. acted out frequently around her sister. (R. at 73).

However, L.F. was able to get along with adults and peers, although L.F. did exhibit some

shyness. (R. at 73). Plaintiff never received calls from L.F.'s school reporting misbehavior. (R.

at 44).

  At school, L.F. participated in a normal curriculum with some adaptations. (R. at 49).

L.F. had the assistance of a learning support/inclusion teacher who accompanied L.F. to certain

classes. (R. at 49, 53 – 54). L.F. was also able to seek additional help in a special resource

room. (R. at 52). She was permitted to take her tests in the resource room when she felt that she

needed assistance. (R. at 52 – 53). Plaintiff discussed L.F.'s poor performance in physical education, and stated that L.F. needed to be pushed because she did not engage in physical activity on her own. (R. at 51). Plaintiff generally characterized L.F.'s grades as, "okay." (R. at 69).

While at home, L.F. helped with chores such as washing dishes and sweeping. (R. at 43, 46). Sometimes L.F. was reluctant or unwilling to help when asked. (R. at 46). In the past it was also difficult to persuade L.F. to complete her homework. (R. at 66). Otherwise, she could be found watching television or using the computer. (R. at 43). L.F. enjoyed going online to socialize on websites such as MySpace. (R. at 43, 72). Plaintiff felt L.F. was fairly proficient with the computer. (R. at 72). L.F. did not exhibit difficulties communicating. (R. at 43). L.F. frequently used her cellular phone to send messages to friends. (R. at 48). She actively maintained friendships, and participated in school activities and other leisure activities with friends. (R. at 44 – 45, 48 – 49).

## IV. STANDARD OF REVIEW

For a claimant under the age of eighteen to be eligible for SSI benefits under the Act, he or she must demonstrate to the Commissioner the existence of a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906. The Commissioner utilizes a three-step sequential analysis to decide if a child claimant meets the necessary requirements for receipt of benefits. 20 C.F.R. § 416.924. The Commissioner will indicate his findings at each step. 20 C.F.R. § 416.924(g).

16

The Commissioner must determine: (1) whether the child claimant is engaging in substantial gainful activity; (2) if not, whether the child claimant has a severe impairment or combination of impairments that is severe; and (3) if so, whether the medical evidence of the child claimant's impairment or combination of impairments meets or equals the criteria listed for disability in 20 C.F.R., Pt. 404, Subpt. P, App'x 1.  20 C.F.R. §§ 416.924(a) – (d), 416.925.

At Step 3, if a child claimant does not explicitly meet the criteria for a listed impairment, the ALJ must determine if his or her severe impairment(s) are medically or functionally equivalent to the listed impairments.  20 C.F.R. §§ 416.924(d)(1) – (2), 416.926, 416.926a. Medical equivalence will be found whether or not a child claimant's severe impairment is listed, if findings related to the child claimant's impairment(s) are at least of equal medical significance to required criteria of analogous listed impairments.  20 C.F.R. § 416.926(b)(1) – (4).

Further, even if a severe impairment does not meet or medically equal a listed impairment, functional equivalence may be found based upon an analysis of six general domains of functionality.  20 C.F.R. § 416.926a.  The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others, (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i) – (vi).  If the Commissioner finds that a child claimant has "marked" limitation in at least two of the six domains, or "extreme" limitation in at least one of the six domains, benefits will be awarded.  20 C.F.R. § 416.926a(d).  "Marked" limitation "interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  "Extreme" limitation "interferes very seriously with your ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

17

Also, irrespective of the domain being analyzed, when evaluating a child claimant's degree of functioning, the Commissioner will explore the disparity in functioning between the child claimant and unimpaired children of the same approximate age. 20 C.F.R. §§ 416.924a(b)(3)(i), 416.924b(a)(1) – (2); *See also* Social Security Ruling ("SSR") 09-29 at *3 ("The critical element in evaluating the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities").

Judicial review of the Commissioner's final decision is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

---

[3]     Section 405(g) provides in pertinent part:
    Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]     Section 1383(c)(3) provides in pertinent part:
    The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d Cir. 1986).

## V.   DISCUSSION

In his decision, the ALJ concluded that L.F. suffered from severe, medically determinable impairments in the way of obesity, separation anxiety disorder, and learning disorder. (R. at 10). However, in spite of the limitations stemming from said impairments, the ALJ determined that L.F.'s severe impairments did not meet any of the listed impairments in 20 C.F.R., Pt. 404, Subpt. P, App'x 1, nor were her severe impairments medically or functionally equivalent to the listed impairments. (R. at 4 – 24). As a result, L.F. was ineligible for SSI. (R. at 24). Plaintiff

objects to this determination by the ALJ, claiming that the ALJ did not adequately explain why L.F.'s impairments did not meet or medically equal any of the listed impairments, that he did not adequately explain why L.F.'s impairments did not functionally equal any of the listed impairments, and that he improperly rejected a low global assessment of functioning score from an examining physician.  (ECF No. 10 at 3, 7, 16).

Meets or Medically Equals

In her first argument, Plaintiff asserts that the ALJ committed error by failing to specify which impairment listings under 20 C.F.R., Pt. 404, Subpt. P, App'x 1 were not met by L.F., and by failing to provide more than a "boilerplate" explanation for why the ALJ found L.F. did not meet or medically equal said impairments.  (ECF No. 10 at 3 – 7).  Without specifying a listed impairment herself, Plaintiff seems to suggest that L.F. met the requirements for Listing 112.02 (Organic Mental Disorders).  (ECF No. 10 at 4).

As argued by Plaintiff, the Court of Appeals for the Third Circuit in *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, held that a summary conclusion by an ALJ regarding whether a claimant meets a listed impairment is inadequate and "beyond meaningful review."  *Id.* at 119 – 20 (quoting *Clifton v. Chater*, 79 F. 3d 1007, 1009 (10th Cir. 1996)).  Presently, the ALJ stated that:

> The Administrative Law Judge has evaluated the claimant's severe impairments under Listing 112.00 (Mental Disorders) and under SSR 02-1p (Evaluation of Obesity).  However, the medical evidence does not contain the objective signs, symptoms, or findings, nor the degree of functional restriction necessary for the claimant's impairments, considered singly or in combination, to meet or medically equal any section of the aforesaid Listings or Social Security Rulings, nor any section of any other Listing contained in Appendix 1, Subpart P, Regulations No. 4 (see the Discussion of the Medical Evidence at Finding Number 5, *infra*.).  No treating or examining physician or other acceptable medical source has mentioned findings that meet or are equivalent in severity to the criteria of any listed impairment (Exhibits 1F, 2F, 3F, 6F, 7F, and 8F).

(R. at 10).  As indicated within the ALJ's above statement, the rationale for his ultimate

conclusion was provided in later discussion.  As such, the above statement is not necessarily

error requiring reversal or remand.

As has also been held by the Court of Appeals for the Third Circuit, while an ALJ must

analyze all of the evidence in a medical record and provide adequate explanation for his decision,

the ALJ need not "use particular language or adhere to a particular format in conducting his

analysis." *Jones v. Barnhart*, 364 F. 3d 501, 504 – 05 (3d Cir. 2004).  The purpose of *Burnett*'s

holding was to ensure proper development and discussion of the record to allow meaningful

review; however, when determining whether the ALJ's discussion is sufficient for this purpose,

what matters most is whether the decision – read as a whole – "considered the appropriate factors

in reaching the conclusion."  *Id.* at 505.  As such, the form of the ALJ's "boilerplate" statement

is not dispositive; the court must look to the analysis to which the statement refers for its support.

*Sykes v. Barnhart*, 84 Fed. App'x 210, 213 – 14 (3d Cir. 2003).

Listing 112.02 (Organic Mental Disorders) and 112.06 (Anxiety Disorders) may both be

applicable to L.F.'s situation, and have identical "B" criteria.  20 C.F.R., Pt. 404, Subpt. P,

App'x 1.  Plaintiff makes no specific argument that the "A" criteria for either listing would be

met by L.F.  However, for the sake of argument, the court will assume L.F. meets the criteria of

one or the other listing, because a reading of the ALJ's argument illustrates that L.F. did not meet

or medically equal the "B" criteria for either.

The "B" criteria require impairments resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function,
documented by medical findings (including consideration of historical and other
information from parents or other individuals who have knowledge of the child,
when such information is needed and available) and including, if necessary, the

results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R., Pt. 404, Subpt. P, App'x 1.

Plaintiff faults the ALJ for not discussing each of the above criteria explicitly. ECF No. 10 at 6). As support for her contention that L.F. met or medically equaled at least two of the above criteria, she cited to Dr. Deines' statement that L.F.'s problems appeared to be "more severe," because at the age of thirteen, she still requested that her mother stay with her at night. (ECF No. 10 at 6). Dr. Deines also felt that L.F. needed immediate attention to address her anxiety. (*Id.*). Plaintiff cited L.F.'s full-scale IQ scores of 72 and 85 as further support of marked limitation in at least two of the above areas. (*Id.*). It was also mentioned that L.F. continued to require special educational support, and that she scored below her grade level in past standardized testing. (*Id.*).

These arguments lend little support to Plaintiff's assertion of error. As discussed by the ALJ, L.F. had no issues communicating, respecting, or getting along with adults and peers, aside from tension at home with her sister. (R. at 12 – 20). L.F. maintained a number of friendships, socialized frequently, and engaged in social activities outside of her home and school. (R. at 12 – 20). Although she scored lower than her peers on standardized testing, she successfully

22

completed a normal academic curriculum – albeit with adaptations tailored to her impairments – and managed to achieve mostly A and B grades in her courses.  (R. at 12 – 20).  In terms of caring for herself and maintaining personal hygiene, L.F.'s mother indicated that she had no issues.  (R. at 12 – 20).  There were few indications that L.F. had significant difficulty with maintaining concentration, persistence, or pace.  (R. at 12 – 20).

While there was evidence throughout the record that occasionally contradicted these findings, the ALJ properly concluded that the majority of the evidence pointed towards less than marked limitations.  All that an ALJ is required to provide is substantial evidence to support his conclusion; here, the ALJ provided a thorough discussion that – while not explicitly addressing the "B" criteria of 112.02 or 112.06 – considered the appropriate factors and allowed him to reasonably conclude that L.F. did not meet either listing's requirements.

Functionally Equals

Plaintiff next argues that the ALJ did not properly discuss the six domains of functioning, and did not discuss why L.F. did not functionally equal the listed impairments.  More specifically, Plaintiff argues that in failing to account for deficits in L.F.'s functionality when compared with unimpaired children of her age, and having improperly "cherry-picked" evidence to support his conclusions, the ALJ did not create an accurate picture of L.F.'s true degree of limitation in the first three domains: acquiring and using information, attending and completing tasks, and interacting and relating with others.  (ECF No. 10 at 7 – 16).

As an initial matter, it seems obvious to the court that the ALJ's finding of impairments and limitations necessarily implied that L.F. was not functioning at the same level as a normal child her age; Plaintiff provides no evidence that an explicit statement by the ALJ to that affect would have altered the outcome of this case.  SSR 09-2p provides that while a child claimant's

23

ability to engage in age-appropriate activities is "the critical element" in analyzing functioning, the ALJ need only provide evidence sufficient to create a clear picture of a child claimant's functioning in each domain. *Id.* at *3. Plaintiff provided no evidence that the ALJ – or any other source – was comparing L.F. to any group other than normal, unimpaired children, particularly in light of the undisputed fact that L.F. completed most of her work in a normal classroom setting, received grades in regular academic courses, and was compared to other children of her grade level on standardized testing. As such, Plaintiff's claim that the ALJ was considering L.F.'s impairments and limitations without keeping the capabilities of unimpaired children in mind is groundless.

Moving to Plaintiff's next point – that the ALJ failed to paint an accurate portrait of L.F.'s limitations in terms of acquiring and using information, attending and completing tasks, and interacting and relating with others – the court finds that the ALJ provided substantial evidence, based upon his review of the record, to support his ultimate decision to deny benefits.

With respect to the first domain, "Acquiring and Using Information," an ALJ must consider a child claimant's ability to learn information and think about and use the information learned. SSR 09-3p; 20 C.F.R. § 416.926a(g). Plaintiff argues that the ALJ failed to properly credit Dr. Carosso's finding that L.F. had poor attention, concentration, insight, and judgment. The ALJ also allegedly failed to adequately consider Dr. Deines' findings that L.F. appeared to be more limited than objective testing suggested, that her language and verbal skills were worse than expected, her verbal comprehension was borderline, and her perceptual reasoning was seriously impaired. The ALJ also allegedly failed to appreciate the fact that: (1) an IQ score of 85 was still far below average; (2) L.F. had a lengthy list of accommodations at school; (3)

24

objective tests did not yield particularly positive results; and (4) L.F.'s learning support/inclusion

teacher observed some significant limitations in functioning at school.

The ALJ did, contrary to Plaintiff's argument regarding the first domain, discuss Drs.

Carosso and Deines' findings at fair length.  (R. at 12, 17 – 20).  The ALJ recognized Dr.

Carosso's observations that L.F. had attachment issues, insecurity, anxiety, and conflict at home.

(R. at 12, 17).  He also noted L.F.'s problems with concentration, attention, insight, and

judgment.  (R. at 12, 17).  Despite these findings, the ALJ found it noteworthy that Dr. Carosso

still felt that L.F. exhibited near normal intellectual functioning.  (R. at 12, 17).  L.F. was also a

hard worker, she functioned well behaviorally, she showed appropriate affect, she had normal

speech, and she expressed a willingness to work with a therapist to address acting out towards

her sister at home.  (R. at 12, 17).  Dr. Carosso also gave L.F. a fair prognosis, and assessed a

GAF score of 58 – connoting only moderate difficulties in functioning.  (R. at 12, 17).  Further,

while Dr. Deines indicated the existence of limitations, L.F.'s IQ of 85 was not low enough to be

considered even mildly mentally retarded.  (R. at 12, 17).  Dr. Deines also felt that L.F.'s

prognosis was optimistic and her anxiety issues could be addressed with proper therapeutic

intervention.  (R. at 12, 17).

Despite findings in her RR's, IEP's, standardized tests, and a report by a learning

support/inclusion teacher indicating significant functional deficits, the ALJ noted that L.F. also

was regularly noted to have significant academic strengths.  (R. at 13 – 14, 17).  These strengths

included consistently receiving primarily A and B grades in regular courses, including eighth

grade level algebra, despite having tested at a third and fourth grade level in mathematics.  (R. at

13 – 14, 17).  While she did receive a fair amount of accommodation in school, she only utilized

these resources as she felt was necessary, and was consistently noted to be hard working,

responsible, and more capable than she believed.  (R. at 17).  Additionally, following a review of the record, Dr. Rattan concluded that L.F. experienced less than marked limitation in acquiring and using information.  (R. at 13, 17).  Based upon this thorough discussion, the court finds that the ALJ provided substantial evidence to support his conclusion that L.F. had less than marked limitation in this domain.

Plaintiff must keep in mind that the ALJ need only provide such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Ventura*, 55 F. 3d at 901 (quoting *Richardson*, 402 U.S. at 401).  This is not an exacting standard.  Moreover, although an ALJ must provide sufficient discussion to allow the court to determine whether any rejection of evidence was proper, he or she need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett*, 220 F.3d at 121; *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)). In the present case, the ALJ clearly considered and weighed the evidence for and against L.F.'s claim of disability, and concluded that the evidence did not favor a finding of disability.  The ALJ, therefore, adequately met his responsibilities under the law.

Turning to the second domain, "Attending and Completing Tasks," an ALJ must consider a child claimant's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks.  SSR 09-4p; 20 C.F.R. § 416.926a(h).  Plaintiff claims that the ALJ failed to properly analyze L.F.'s functioning in this domain because the ALJ allegedly failed to again consider Dr. Carosso's finding that L.F. had poor attention, concentration, insight, and judgment, failed to consider Dr. Deines' finding that L.F. would have trouble completing tasks at home, and failed to properly interpret Dr. Deines' finding that L.F. knew how to avoid beginning/completing undesirable tasks.

Without re-hashing facts already discussed at length, the court notes that the ALJ did discuss these findings, but also noted consistent findings that L.F. was a hard worker at school, was responsible, and had a high homework completion rate – despite allegedly having significant difficulty completing tasks at home.  (R. at 18 – 19).  Dr. Deines found that L.F. had no difficulties completing work at school, was able to follow directions, could ask for information, could explain things to others, could attend to and complete tasks, was able to focus, could deal reasonably with frustration, could maintain attention, and had no difficulty changing activities or shifting her attention.  (R. at 12, 18 – 19).  L.F. was capable of beginning, carrying through, and finishing activities of her choosing.  (R. at 12, 18 – 19).  Further, L.F.'s mother stated that L.F. was capable of chores and self-care at home.  (R. at 19).  Dr. Rattan indicated that L.F. had no limitation in this domain.  (R. at 19).  Based upon this discussion of facts by the ALJ, the Court does not observe the "cherry-picking" alleged by Plaintiff, but an attempt by the ALJ to reconcile inconsistencies in the evidence.  Here, the ALJ decided that L.F. was less than markedly limited in attending to and completing tasks, and the Court finds this conclusion to be supported by substantial evidence.

As to the third domain, "Interacting and Relating with Others," an ALJ must consider a child claimant's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others.  SSR 09-5p; 20 C.F.R. § 416.926a(i).  Plaintiff claims that the ALJ's findings for this domain were flawed because the ALJ allegedly ignored L.F.'s trouble functioning at home, in general.  Specifically, the ALJ allegedly failed to adequately discuss Dr. Carosso's findings that L.F. experienced significant difficulty interacting with her sister, was "clingy" with her mother, and was easily upset, and Dr. Deines' findings that L.F. responded poorly to criticism and had difficulty with rules.

27

Once again, the Court finds that the ALJ did, in fact, countenance these findings. However, he did not give these findings dispositive weight because of other evidence on the record, including: L.F.'s well-documented history of maintaining friendships and a social life, her positive interactions with adults and peers at school, her generally respectful, pleasant, and polite nature as observed by educators, her willingness to engage in therapy to address her issues with her sister, Dr. Deines' belief that L.F. was capable of adhering to social norms, and Dr. Deines' optimistic prognosis that L.F.'s dysfunction at home could be addressed with proper therapeutic intervention. (R. at 12, 20). The ALJ also noted Dr. Rattan's finding that L.F. had less than marked limitations in this domain. Based upon this discussion of the facts weighing for and against L.F.'s claim, the court finds that the ALJ reasonably concluded that L.F. suffered less than marked limitation in the third domain.

GAF Scores

Lastly, Plaintiff argues that the ALJ's opinion should be reversed or remanded due to his failure to properly discuss a GAF score of 50 which was assessed by Dr. Deines. (ECF No. 10 at 16 – 20). Plaintiff is displeased with the ALJ's discussion, because in according Dr. Deines' GAF score of 50 little weight, he cited to notes in her report which appeared to the ALJ to be inconsistent with a GAF score of 50. (*Id.*). He also noted inconsistency with a score of 58 assessed by Dr. Carosso, and inconsistency with the much less severe functional limitations findings of Dr. Rattan. (*Id.*). The use of this evidence to reject the GAF score of 50 was allegedly insufficient.

After consideration, the Court finds this argument unpersuasive. The evaluation in which Dr. Deines assessed the GAF score of 50 contained no explicit discussion of the score's import. While a GAF score of 50 tends to indicate "serious symptoms," it does not, alone, correlate to

28

any specific limitations.  The score may have been meant to reinforce the nature of the limitations listed by Dr. Deines; however, as already discussed, the ALJ thoroughly analyzed Dr. Deines' findings, considered the findings with the rest of the record, and made determinations regarding L.F.'s degree of functional limitation.  Therefore, to the extent that the GAF score of 50 tended to weigh in favor of greater limitation than found by the ALJ, this court finds that the ALJ dealt with this issue when he discussed Dr. Deines' findings as a whole.  As such, all of the other evidence that the ALJ discussed, and that this Court recognized as militating against a finding of greater limitation, also militated against whatever degree of greater limitation may have been supported by the GAF score of 50.  As a result, substantial evidence supported the ALJ's rejection of the GAF score of 50.


**VI.    CONCLUSION**

Based upon the forgoing, the decision of the ALJ was supported by substantial evidence from the record.  Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted. The decision of the ALJ is affirmed. An appropriate Order follows.


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc.    Robert B. Savoy, Esq.
Paul Kovac
Assistant United States Attorney

(*Via Electronic Mail*)

29